**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MICHELLE MONEE AQUART** | § | |
| | § | |
| **v.** | § | **A-09-CA-804-AWA** |
| | § | |
| **ASCENSION HEALTH INFORMATION** | § | |
| **SERVICES** | § | |

## ORDER

Before the Court are: Ascension Health Information Services' Motion for Summary Judgment (Clerk's Doc. No. 34); Michelle Aquart's Motion for Partial Summary Judgment (Clerk's Doc. No. 35); Michelle Aquart's Response to Ascension Health Information Services' Motion for Summary Judgment (Clerk's Doc. No. 45); Ascension Health Information Services' Response to Michelle Aquart's Motion for Partial Summary Judgment (Clerk's Doc. No. 46); Ascension Health Information Services' Reply to Michelle Aquart's Response (Clerk's Doc. No. 49); and Michelle Aquart's Reply to Ascension Health Information Services' Response (Clerk's Doc. No. 52). The parties consented to the undersigned's jurisdiction (Clerk's Doc. No. 55). After reviewing the parties' briefs, relevant case law, as well as the entire case file, the undersigned submits the following order.

## I.      Introduction

In this case, Michelle Aquart sues Ascension Health Information Services under two federal acts: the Family and Medical Leave Act (FMLA), and the Americans with Disabilities Act (ADA). Ascension moves for summary judgment on both claims. Ascension opposes the FMLA claim on three grounds: (1) it argues that Aquart was not a covered employee because she had not worked for Ascension for a year; (2) Aquart did not request FMLA leave; and (3) Ascension did not deny,

interfere with, or restrain Aquart's exercise of her FMLA rights.  Aquart opposes the motion, and makes her own request for partial summary judgment on the issue of her eligibility to pursue her FMLA claim.  With regard to the ADA claim, Ascension seeks summary judgment on three grounds: (1) Aquart was not a qualified individual; (2) she was terminated for legitimate non-discriminatory reasons; and (3) it accommodated her migraine problems.

## II.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence demonstrating a genuine fact issue.  *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to

defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id*. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id*. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, then summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## III.   Factual Background

Both parties filed motions for summary judgment, but Ascension filed its motion against all of Aquart's claims. Accordingly, the Court will draw all factual inferences in favor of Aquart. In June of 2007, Aquart—living in Alabama—applied for a position with Ascension in Austin. After receiving many applications, and conducting interviews, Ascension offered the job to Aquart in a July 6, 2007 letter. The letter listed her job title, starting salary, and suggested a July 23, 2007 start date. Aquart accepted Ascension's offer on July 9th, but she had trouble winding up her affairs in Alabama and moving to Austin by July 23, 2007. Accordingly, she did not begin work until she attended orientation on August 6, 2007.

Aquart suffers from chronic migraine headaches, and she experienced migraines from the outset of her employment with Ascension. With Ascension's approval, when affected by a migraine, Aquart would work from home, visit her doctor, or work partial days. Occasionally, this would require Aquart to take sick or vacation days. Aquart also requested Ascension to equip her with an ergonomic headset, which it did. While Ascension never refused Aquart's requests for time off or to work from home, Aquart worried about missing too much work. Leslie Hooker, Aquart's supervisor, heightened Aquart's fear when she made a comment about how some companies get rid of employees with too many absences. Aquart viewed this comment as a warning that she was missing too much work.

In February of 2008, Aquart contends she spoke to Hooker about possibly taking FMLA leave. On January 30, Aquart sent an e-mail to a local human resources employee, Kini Johnson, asking "who the HR person for Ascension" was, as she "needed a form." Johnson responded asking what type of form Aquart needed. In response Aquart stated:

> I need a FMLA form. I am not about to go on FMLA leave[.] My neurologist is wanting to fill this out because I will be missing work occasionally due to migraines. She mentioned she['d] rather complete the FMLA rather than a work excuse.

Johnson forwarded the latter message to Kelley Farmer, a Human Resources representative for Ascension located in St. Louis. Farmer responded on January 31, sending Aquart an FMLA request form via e-mail, stating that "[w]hen completed, please return via fax." When Farmer had heard nothing from Aquart after several weeks, she sent Aquart an e-mail on March 6, 2008. asking if she still planned on requesting FMLA leave. Aquart responded, telling Farmer that she was not certain, she did not think so, but had a doctor's appointment the next day and would know more after that. A week later, having still heard nothing from Aquart, Farmer sent another e-mail inquiry, stating that

4

she "was just checking in to see if you are going to be using our FMLA program," and Aquart responded less than an hour later: "No, maam."  Notwithstanding these e-mails, Aquart now claims that she completed the form and turned it in to Hooker in February, and that this was sufficient to make a request for FMLA leave.  Notably, she failed to mention any of this in her e-mail exchange with Farmer, which took place after Aquart claims she gave the form to Hooker.  The form itself was completed by Aquart's physician and did not indicate that Aquart was incapacitated or that she required intermittent leave or a reduced schedule.  Rather, it stated only that Aquart would sometimes require time off or time to visit the doctor.

In May, Aquart again spoke to Hooker about taking FMLA leave after Aquart injured her knee while on vacation.  In early June, Aquart filed a request for FMLA leave for her knee surgery scheduled in July, and her request was forwarded according to Ascension's policy to a third party, Sedgwick CMS, which handles all of Ascension's employees' FMLA requests.  Sedgwick denied the request because Ms. Aquart had not worked for Ascension for at least twelve months.  Aquart rescheduled her surgery for August, but she had not re-filed for FMLA leave when she was terminated on July 15, 2008.

The summary judgment evidence reflects that during her first few months on the job, Aquart performed satisfactorily.  As she received more responsibility, however, several of her coworkers expressed to Hooker their concern about Aquart's competency.  Russell Carter, a fellow SD analyst, performed quality checks and discovered several significant errors in Aquart's work.  Another SD analyst on her team, Sandi Ward, also voiced her concern about Aquart's performance level to Hooker.  Both coworkers assisted Aquart and checked her work for completeness and accuracy. According to Greg Houston, Hooker's supervisor, Aquart's lack of proficiency prevented Ascension

from assigning more complex assignments to her.  Because of Aquart's perceived problems, Ascension gave her only basic tasks and assignments.

Aquart does not refute any of her coworkers' and supervisors' assessments of her technical performance.  Instead, she contends that her coworkers' assessments are not relevant to this case because they did not supervise her, and she also points to Hooker's observations commending Aquart in completing her goals and training on time.  Further, Aquart notes that her written reviews did not mention deficient performance.  And while Aquart concedes that Hooker told her that she needed to improve her behavior and that some of her coworkers had complained about both her technical aptitude and her "cubical etiquette," she characterizes these conversations as "minor" reprimands and not indicative of substantial problems.  These verbal sessions brought short-term improvement, but after Ward told Hooker that Aquart failed to meet Ward in early May of 2008, at 6:30 a.m. to finish a project, Hooker placed her on a 60-day performance improvement plan.  Halfway through her plan, she had shown improvement.  But by the end of the period, she had reverted to her previous problems.

Aquart's termination followed a series of specific events detailed in the summary judgment evidence, none of which are disputed by Aquart.  Specifically, on the Friday before she was terminated, Aquart met with Carter and Hooker to discuss a project.  During the meeting, Carter and Hooker found enough mistakes in Aquart's work that Carter had to redo her work.  Aquart could not explain why she made the mistakes; instead, she laughed.  The following Monday, Hooker learned that Ward had to stay for several hours after her shift to assist Aquart and correct her work on a project.  Finally, that same day, Hooker discovered that Aquart lied to her about completing a project.  Aquart told Hooker she finished the project, but another Ascension employee was working

on the project several days after Aquart told Hooker it was done.  These three events, together with Aquart's failure to sustain a high level of performance during her probationary period, led to Ascension firing her on July 15, 2008.

Aquart argues that Ascension did not fire her because of the problems with the technical aspects of her job or for the three events detailed above.  She contends Ascension's true motivation stems from her frequent absences for her migraines and the future absences her knee surgery was going to cause.  She premises her position on two points: (1) her reviews were positive until she inquired about FMLA leave in February; and (2) Hooker told her in January that companies fire employees who miss too much work.  Aquart contends that this demonstrates that Ascension fired her because of her health problems and the amount of time out of the office they required.  Aquart's counsel contends the January discussion between Aquart and Hooker is direct evidence that Aquart was fired because of her disability and her FMLA inquiries.  To rebut Ascension's assertion that it fired her for her technical deficiencies, Aquart points to her preliminary performance reviews and Hooker's deposition testimony that Aquart performed well for the first several months.  She also points to the application process[1] to demonstrate that she possessed the necessary skills for her position.

## IV.     Analysis

### A.     Aquart's FMLA Claim

The FMLA provides an "eligible employee" up to twelve weeks of unpaid leave in a twelve-month period if the employee suffers a "serious health condition."  29 U.S.C. § 2612(a)(1).  It is

---

[1]Ascension received numerous applications and interviewed several candidates, and ultimately chose Aquart because it believed she was the most qualified applicant.

illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act.  29 U.S.C. § 2615(a)(1).  Aquart argues that she requested FMLA leave twice and Ascension denied, interfered with, or restrained her exercise of her FMLA rights.

Before addressing the merits of her claim, the Court must first determine whether Aquart is an "eligible employee."  To be eligible, an employee must have "been employed for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title." 29 U.S.C. § 2611(2).  Aquart received an offer letter on July 6th, accepted it July 9th, started work on August 6th, and then was fired the following July 15th.  If her employment began when she accepted the job offer, then she became an eligible employee before she was terminated.  If her employment began when she started working at Ascension in August, then she was not eligible for FMLA leave.

To answer the question of when Aquart's employment commenced turns on the definition of "employ."  The FMLA cross-references 29 U.S.C. § 203 for its definition of "employ."  29 U.S.C. § 2611(3).  Section 203 defines employ as "suffer or permit to work."  29 U.S.C. § 203(g). Aquart—capitalizing on the Supreme Court's language that this definition has "striking breadth"[2]—attempts to argue that she was "employed" when she accepted the terms of the offer letter.  Aquart contends that she was an employee at that time because she filled out forms Ascension sent her, submitted to a background check, stopped searching for other jobs, indemnified Ascension for potential legal claims, and moved to Austin.  She did not, however, request remuneration for any of these tasks, which is not surprising, because her job description failed to mention filling out forms, submitting to background checks, ceasing job searching, or any other of these tasks as part

---

[2]*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

of her job duties.  Still, she argues these actions, combined with her acceptance of the job offer, made her "employed."

Aquart is unable to cite any precedent to support her position, and the Court has not located any.  Notably, the Fifth Circuit has interpreted the phrase "suffer or permit to work" to require the employee to be engaged "under circumstances where an obligation to pay" arises.  *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768, 769 (5th Cir. 1945) (interpreting the phrase as used in the Fair Labor Standards Act); *see also Plumley v. S. Container, Inc.*, 303 F.3d 364, 369–70 (1st Cir. 2002).  *Walling* addressed whether railway trainees were entitled to compensation under the FLSA for the time spent training, during which time they were learning the actual duties they would carry out as non-trainee employees.  Thus, the *Walling* employees actually had a better argument than Aquart, as Aquart makes no claim that she was doing anything prior to August 6, 2007, that even resembled her job duties once at work.  The *Walling* decision also conforms with the common legal definition of employment.  The Fifth Circuit previously refused to expand the provision defining who could sue under the FMLA because the new interpretation would be "divorced from its literal meaning."  *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 374 (5th Cir. 2008).  Black's Law Dictionary defines "employment" as "[w]ork for which one has been hired and is *being paid* by an employer."  BLACK'S LAW DICTIONARY 604 (9th ed. 2009) (emphasis added).  Aquart fails to point to any decision overruling *Walling,* and she conceded at the hearing on this motion that Ascension had no obligation to pay Aquart for any time prior to August 6, 2007.

Without case law to support her argument, Aquart instead relies on cases addressing how to differentiate independent contractors from employees.  *See* Plaintiff's Motion for Partial Summary Judgment at 8–9 (citing *Herman v. Express 60-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th

9

Cir. 1999); *Reich v. Circle C. Inv., Inc.*, 998 F.2d 324 (5th Cir. 1993); *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 876 (5th Cir.1989); *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985)).  These cases are not on point, however, as there is no question that Aquart was an employee of Ascension, not an independent contractor.  No court has ever applied the "economic realities test" of these cases to determine when a person is "employed" for purposes of satisfying the eligibility requirements of the FMLA, nor has any court used these tests to determine whether someone was "employed" after accepting an offer of employment, but before they had reported to work, or had performed any compensable tasks.  These decisions are irrelevant to this case.

As noted, Aquart has failed to cite any authority supporting her expansive definition of employee.  And her case differs significantly from cases distinguishing employees from independent contractors.  Rather, the tasks Aquart uses to demonstrate she was an employee (filling out forms, moving) resemble the tasks the trainees in *Walling* performed.  Because the Court finds Aquart was not an eligible employee under the FMLA, she cannot maintain her claim.  While she would have become eligible in August, she was terminated before her FMLA rights vested, so she cannot maintain an FMLA claim.[3]

**B.    Aquart's ADA Claims**

Aquart asserts two ADA claims against Ascension: (1) it failed to accommodate her disability; and (2) it terminated her because of her disability.

---

[3]Because the Court finds Aquart was ineligible for FMLA leave, it does not reach the contested issue of whether Aquart actually requested leave in February of 2008.

10

1.        **Failure to Accommodate**

If a qualified individual requests an accommodation, then the "employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009). Not all requested accommodations are appropriate, and the ADA only "provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Id.* Aquart did not explicitly request an accommodation, reasonable or otherwise. Instead, she bases her failure to accommodate claim on Hooker knowing of Aquart's migraines and doing "nothing to engage Ms. Aquart in a dialog about her work schedule." Plaintiff's Response to Defendant's Motion for Summary Judgment at 10. This assertion is directly contradicted by Hooker's deposition testimony. In her deposition, Hooker testified that Aquart came to her within a month of starting work and gave Hooker a doctor's note. Hooker then asked how she could help Aquart and provided Aquart with an ergonomic headset. Hooker's Deposition at 60:5–25. In fact, Hooker offered to help Aquart after each doctor's appointment. *Id.* at 68:16–21. Aquart does not cite to any evidence to contradict Hooker's recollection.

While Aquart did not request a specific recommendation, she argues that providing Hooker with documents from her doctor that stated Aquart required intermittent care was tantamount to a request for intermittent leave. Even if the documents suffice as a request, Ascension never denied Aquart's requests for time off. Rather than contend that Ascension failed to accommodate her requests for time off work, Aquart states that "Hooker began to blemish her otherwise good work record with unsubstantiated criticism of her work." Plaintiff's Response to Defendant's Motion for Summary Judgment at 10. This, however, is not evidence of a failure to accommodate; rather, it at best would potentially support a disability discrimination claim.

11

Finally, "it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed," and lacking such a request, "the employer cannot be held liable for failing to provide one." *Taylor v. Principal Fin. Group, LLC.*, 93 F.3d 155, 165 (5th Cir. 1996). Aquart shifts the burden to accommodate entirely to Ascension, but "[t]he responsibility for fashioning a reasonable accommodation is shared between the employee and the employer through an interactive process." *Smith v. Shinseki*, 716 F. Supp. 2d 556, 566 (S.D. Tex. 2009) (quotation omitted). Because Aquart never requested an accommodation and failed to engage in "an interactive process," she cannot maintain her failure to accommodate claim. Further, the record indicates that Ascension granted every request for time off from work, so Aquart could not satisfy the second prong of a failure to accommodate claim either.

### 2.     Wrongful Termination

Aquart also claims Ascension violated the ADA when it terminated her because of her disability. The ADA forbids discrimination against disabled individuals in major areas of public life, including employment (Title I of the Act, 42 U.S.C. §§ 12111–12117), public services (Title II, *Id.* at §§ 12131–12165), and public accommodations (Title III, *Id.* at §§ 12181–12189). *PGA Tour*, *Inc. v. Martin*, 532 U.S. 661, 675 (2001). In ADA cases in which the plaintiff relies solely on circumstantial evidence, a prima facie case requires evidence that: (1) at the time of the employment action, the plaintiff had a "disability;" (2) she was qualified for the position for which she sought employment or continued employment; (3) she suffered an adverse employment action because of her disability status; and (4) she was replaced by or treated less favorably than non-disabled employees. *Rodriguez v. Conagra Grocery Prods. Co.*, 436 F.3d 468, 474 (5th Cir. 2006).

If Aquart establishes a prima facie case, then the burden shifts to Ascension to provide a legitimate, non-discriminatory reason for its action. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007). If Ascension provides a non-discriminatory reason, then the burden reverts back to Aquart to show that Ascension's justification is merely pretext for discrimination. *Id.* There is no dispute regarding the fact that Ascension fired Aquart, or that Ascension replaced her with a non-disabled employee. The Court will therefore focus on the first two prongs of Aquart's prima facie case.

### a.  Aquart's Disability

"Disability" means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Dupre v. Charter Behavioral Health Sys.*, 242 F.3d 610, 613 (5th Cir. 2001). A disability is an impairment that substantially limits a major life activity. *Dupre*, 242 F.3d at 614. "Merely having an impairment does not make one disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). Instead, a plaintiff must "demonstrate that the impairment limits a major life activity." *Id.*

Aquart does not specifically identify which major life activity her migraines substantially limit. Rather, she claims her chronic migraine disorder "substantially limits one or more of her major life activities." Plaintiff's Response to Defendant's Motion for Summary Judgment at 10. Later in her response, she resorts to boilerplate language and claims she "presented competent summary judgment evidence demonstrating that she suffers from a physical impairment (chronic migraine disorder) that substantially limits one or more of her major life activities, including caring for himself [sic], walking, thinking, eating, drinking, and working." The record evidence, however,

13

does not support such a broad claim.  Rather, there is only evidence that Aquart's migraine disorder potentially affects her ability to work.

The term "substantially limits" in the context of the major life activity of working means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j).  "Whether an impairment is substantially limiting depends on '(1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact.'"  *Smith v. Tuesday Morning Corp.*, No. 3-06CV1046, 2007 WL 2851107, at *4 (N.D. Tex. Oct. 2, 2007).

Aquart offers her testimony and the testimony of her physician, Dr. Marci Roy, to support her contention that she is disabled under the ADA.  At first, Aquart suggests she could work a full day from home, but she later retreats and says she could not always work an eight-hour day. Deposition of Aquart at 90:8–95:20.  She also testified that her headaches would affect her ability to see, focus, walk, and think.  *Id.* at 179:19–25.  Dr. Roy testified that Aquart told her that her headaches occasionally prevented her from performing her job duties.  Deposition of Roy at 43:3–10. While Aquart often experienced pain with her migraines, she rarely had auras, which would affect sensory and motor functions.  *Id.* at 52:8–22.  The pain could affect her ability to think and concentrate.  *Id.* at 53:1–24.

Ascension concedes that Aquart had an impairment but contends that her migraines were not so severe as to substantially limit a major life activity.  Aquart took isolated days off from work and occasionally worked from home, but she did not require limitations on her duties or work schedule. This argument challenges the second prong of whether an impairment is substantially limiting.

14

Often Aquart's headaches dissipated in a day or two.  Still, she either missed work, worked from home, or left for a doctor's visit close to forty times during her eleven months of employment.  The frequency of her absences and the testimony concerning the debilitating nature of her condition create fact issues that preclude summary judgment on this basis.

### b.        Aquart's Qualifications

To be a "qualified" individual with a disability, Aquart must be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The Code of Federal Regulations further defines a "[q]ualified individual with a disability [as] an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position and . . . can perform the essential functions of such position."  29 C.F.R. § 1630.2(m).

Ascension argues that Aquart does not possess "the requisite skill, experience, education and other job-related requirements" because, as it learned over her eleven months of employment, she lacked the technical aptitude needed to perform her job's more complex tasks.  Despite reviewing Aquart's application and resume, interviewing Aquart, and selecting her from a group of applicants, Ascension argues Aquart merely "appeared to be qualified at the time she was hired."  Ascension's Motion for Summary Judgment at 15.

As Ascension conceded at the motions hearing, this is not the typical challenge to a plaintiff's classification as qualified.  Generally, the question centers on whether the plaintiff's *disability*, with or without a reasonable accommodation, prevents her from performing the essential functions of a position.  The Court does not agree with Ascension's position that Aquart was not qualified because

15

of her lack of technical skill.  Rather, its argument suggests that Aquart was qualified, but it terminated her because of her poor job performance.  If poor performance were enough to demonstrate an employee was not "qualified" under the ADA, then the *McDonnell-Douglas* burden-shifting analysis would be superfluous, as a court would never need to reach the question of whether the performance deficiencies were the reason for termination, since the performance problems would render the plaintiff "unqualified."  Ascension has failed to demonstrate that Aquart was not a "qualified" individual under the ADA.

### c.     Ascension's Legitimate, Non-Discriminatory Reason

The burden thus shifts to Ascension to provide a legitimate, non-discriminatory reason for firing Aquart.  Ascension contends it terminated Aquart because of her poor performance, not her migraines.  As noted earlier, the evidence shows that for the first several months of her employment, Aquart kept up with her work and training obligations.  Her early performance reviews did not contain concerns about her expertise, but Ascension argues she never progressed out of the learning phase, and as it started assigning more complex tasks to Aquart, she could not adequately complete them.

To support its position, Ascension offers the deposition testimony of Hooker and affidavits from two of Aquart's coworkers, Ward and Carter.  Carter and Ward worked on the same team with Aquart and they often worked together on various projects and tasks.  Carter and Ward approached Hooker to express their concern about Aquart's work.  Carter checked Aquart's work and often found errors.  Carter first started noticing the problems after Aquart had worked at Ascension for a few months, and the problems endured until Ascension fired her.  Carter met with Aquart and Hooker the Friday before Aquart was fired, and he discovered so many problems with Aquart's work

16

on a particular project that he had to redo it.   Ward echoed Carter's description of Aquart's proficiency in her affidavit.  She stated that Aquart never reached the level where she could operate autonomously.  Because Aquart was struggling with her performance, Hooker asked Ward to provide Aquart additional training and assistance.  In May, Aquart and Ward worked on a project until late at night but could not complete it.  They agreed to return at 6:30 a.m. to finish the task, but Aquart did not come in early.  When Ward asked her why she did not come in early, Aquart laughed and said she thought Ward was joking.  Ward also had to work a double shift shortly before Aquart was fired because Ward noticed Aquart had made significant mistakes on a project and was concerned that, uncorrected, Aquart's work product would cause significant problems.

Hooker became concerned with Aquart's performance around February of 2008 and had numerous discussions with Aquart about her job performance.  In response, Aquart told Hooker she did not receive adequate training.  Aquart's lack of proficiency caused significant problems.  Not only were coworkers required to check her work and occasionally work overtime to correct it, but Ascension could also not evenly distribute the work among the analysts.  According to Houston's affidavit, Aquart's lack of proficiency prevented Ascension from assigning more complex assignments to her.  Because of Aquart's perceived problems, Ascension gave her only basic tasks and assignments.

Aquart does not deny any of the incidents Ascension relies on in its motion for summary judgment.  Rather, she attempts to characterize the events as minor.  To dispute Ascension's claims that she lacked the requisite technical skill, Aquart points to her early positive reviews.  Hooker also admitted that Aquart was well qualified on paper, interviewed well, and had the most impressive application.

17

Instead of denying that her coworkers found numerous errors in her work, stayed late to finish her work, and expressed their concerns about her poor performance to Hooker, Aquart dismisses their testimony as irrelevant. But Aquart fails to offer any support for this position. Her coworkers worked intimately with her for months and were often assigned to check her work for errors. The co-workers' testimony elucidating Aquart's ineptitude and its effect on their workload (and the patients served by Ascension's services) is not rendered meaningless because they were not her supervisors. Moreover, they repeated their concerns to Aquart's supervisors.

Aquart also attempts to demonstrate pretext by questioning the timing of her poor performance reviews. Aquart contends that Ascension only began to note deficiencies after Hooker told Aquart in January that some companies fire employees for missing too much work and Aquart gave Hooker her FMLA form in February. As already explained, Aquart cannot pursue an FMLA retaliation claim because she was not eligible to request FMLA leave at this time. The circumstances surrounding her "submission" are also puzzling. Aquart claims to have submitted her FMLA form to Hooker in February, but in an email chain with Kelly Farmer—the Ascension human resources representative who provided the form to Aquart—Aquart expressly tells Farmer she had decided not to request FMLA leave, a month after she supposedly gave the form to Hooker. Aquart appears disingenuous by now arguing she did not inform Farmer because she did not want the corporate headquarters to know of her request.

More to the point, even if Aquart requested FMLA leave by handing the FMLA form to Hooker, this has little pertinence to Aquart's ADA discrimination claim. With regard to the ADA claim, the form is at most evidence that Aquart was alerting Ascension regarding the extent of her migraine condition. But the evidence is undisputed that Ascension already knew Aquart suffered

18

from migraines; indeed, it learned this almost from Aquart's first day.  Aquart and Hooker discussed her medical condition, Hooker offered ergonomic equipment, talked to her about what doctor to use, read notes from Aquart's doctor, and allowed Aquart to miss work and work from home when she had a migraine.  Given that Aquart completely fails to dispute the detailed evidence of her work deficiencies, and because Ascension knew about Aquart's migraines before February, Aquart's timing argument fails to demonstrate that the performance issues were raised by Ascension only as a pretext.

Aquart's last argument to show pretext is Hooker's conversation with Aquart about companies firing employees who miss too much work.  Aquart felt that Hooker "menacingly warned her that 'companies . . . get rid of' employees with 'absences.'"  Aquart's Partial Motion for Summary Judgment at 3 (alteration in original).  It is unclear whether Hooker meant it as a threat.  Just as likely, Hooker meant to convey how lucky they are that Ascension does not fire employees because of excessive absences (Hooker took FMLA leave three times while with Ascension).

Whether Hooker "menacingly warned" Aquart or expressed her gratitude that Ascension did not fire employees for absences, however, does not affect the analysis.  Companies may legally fire employees for absences.  *See Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (noting that the ability to appear for work is an essential element of any job and that a "reasonable accommodation" does not require an employer to wait an indefinite period of time for the employee's medical condition to improve); *Roberts v. Unitrin Speciality Lines Ins. Co.*, No. 09-10350, 2010 WL 5186773, at *4 (5th Cir. Dec. 21, 2010) (upholding a company's decision to fire an employee for violating its absenteeism policy).

19

At the motions hearing, Aquart's counsel questioned what would have happened to Aquart had she used up all her sick leave and vacation days, but this question is irrelevant because Aquart never reached that point.  Further, insisting on unlimited sick days as an accommodation is unreasonable as a matter of law.  *See, e.g.*, *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950 (7th Cir. 2001) (stating that "requests for unlimited sick days, if needed, without being penalized, are not reasonable as a matter of law," and that "businesses are not obligated to tolerate erratic, unreliable attendance or to provide an accommodation which would impose an undue hardship on the business.") (quotations and citations omitted).  Accordingly, this also fails to demonstrate pretext.

## V.   Conclusion

Aquart's FMLA claims fail because she had not worked for Ascension for twelve months and therefore was not an eligible employee.  For her ADA accommodation claim, Aquart failed to establish that she requested an accommodation and was refused.  Rather, Ascension often asked how it could help her and never refused her requests to leave work early, come in late, or work from home.  Finally, while Aquart established a prima facie case of disability discrimination, she cannot rebut Ascension's legitimate, non-discriminatory reason that it terminated her for her poor performance.  Accordingly, The Court HEREBY GRANTS Ascension's Motion for Summary Judgment (Clerk's Doc. No. 34) and HEREBY DENIES Aquart's Motion for Partial Summary Judgment (Clerk's Doc. No. 35).

SIGNED this 24th day of January, 2011.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE